IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

PAULANN HART,

Plaintiff,

v.

BADGER MINING CORPORATION,

Defendant.

OPINION and ORDER

17-cv-560-jdp

Plaintiff Paulann Hart was a laboratory technician for Atlas Resin Proppants from 2008 to April 2015, when Atlas merged with defendant Badger Mining Corporation as a result of decreasing demand for the company's products. Badger Mining initially retained Hart in the same job, but, when Badger Mining continued to suffer financially, it reduced its work force at the end of 2015, and Hart was laid off as a result. Hart, who was 58 at the time, alleges that Badger Mining discriminated against her because of her age, in violation of the Age Discrimination in Employment Act.

Badger Mining has filed a motion for summary judgment, Dkt. 14, which is ready for review. The undisputed facts show that Hart was a good employee in many ways, as demonstrated by positive performance reviews that she had received in the past. But the undisputed facts also show that Hart reacted negatively after the company began experiencing financial distress in 2014 and 2015, continually questioning the company's decisions, complaining about the way it was handling the downturn, and repeatedly stating her opinion to both supervisors and coworkers that newer employees should be laid off so that more senior employees would not be affected. These are among the reasons that Badger Mining has given for including Hart in the reduction in force. Although those reasons are not directly related to

Hart's abilities as a technician, Badger Mining was entitled to consider any criteria it wanted, so long as they are nondiscriminatory. Because Hart has not adduced evidence from which a reasonable jury could infer that Badger Mining's reasons are a pretext for age discrimination, the court will grant Badger Mining's motion for summary judgment.

UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted.

**A. Hart hired as a lab technician**

In 2008, plaintiff Paulann Hart started her job as a laboratory technician for Atlas Resin Proppants, which produced coated sand products for use in a variety of industrial applications. Hart was primarily responsible for performing product testing, recording, sample collection, and storage. She also monitored and calibrated testing instructions and ensured that process quality controls and measurement systems were operational.

Hart was supervised by Rhonda Miller from 2012 to mid-2014 and by Lisa Rodriguez after that. At the times relevant to this case, Rodriguez reported to Jamie Morden, who was the "plant coach."

**B. 2014 evaluation**

Rodriguez prepared Hart's 2014 evaluation. Hart's overall rating was "exceeds expectations," which was the highest rating. Her "trend" was "consistent," also the highest rating. The evaluation also includes ratings for nine "competencies:" "safety/environmental," "quality," "team player," "ethics and respect," "communication," "problem solving and decision making," "continuous improvement," "skills and knowledge," and "initiative/drive." Hart

received the highest rating for all of these competencies, with the exceptions of "team player" and "continuous improvement," for which she received the second highest rating.

Rodriguez included the following comments in the evaluation:

- Paulann has a strong work ethic and takes responsibility for her actions and expects others to do the same. She is concerned about others' feelings and respects their opinions and expects the same from her co-workers.

- Paulann has no problem speaking up when the situation calls for it . . . and expressing her opinion/idea about something. Paulann gets along with her co-workers and can effectively communicate any information that's needed. She has improved on her awareness of how she comes across to others and now needs to maintain it. Paulann is not afraid to ask questions for clarification.

- Paulann is very reliable in her attendance and is willing to work overtime anytime. She is willing to work trades with others. Paulann shares information from shift to shift and works well with others. Paulann is also a member of the Associate Team Development team. She tries to be positive and do her part in making it a better work environment.

## C. Rodriguez's comments

In the fall of 2014, Hart and Rodriguez had a conversation about a man in his 50s who was taking a class with Rodriguez at a local technical college. The man's employer was paying for the class and Rodriguez wondered why the employer was "wasting" its money on an "old guy" who was close to retirement. Rodriguez referred to the man as "the old guy" on at least two other occasions.

## D. Atlas's decline in business and Hart's response to it

In late 2014, demand and price for sand-coated products dropped because of a drop in the price of oil.

In January 2015, Hart called a coworker, Julie Hart, to tell Julie that she was upset that Julie had signed up for all the available extra shifts. When Hart questioned whether Julie was acting fairly, Julie hung up. Hart tried to call Julie back, but Julie didn't answer. Hart then sent

Julie the following email: "DID YOUR MOM EVER TELL YOU IT IS NOT NICE TO HANG UP ON PEOPLE!!!!!!" After realizing that she had upset Julie, Hart sent the following email to Rodriguez and Tammy Getter, another team leader:

> THINK I UPSET JULIE. WAS NOT MY INTENTION THOUGH. I ASKED HER HOW IT WORKED OUT THAT SHE ALWAYS GOT TO OUR OT 1st AND HOW WE NEVER GOT A CHANCE @ Taylors. I was asking a simple question. She got mad @ me told me fine I won't sign up for any and then hung up on me. I tried to call her back "n now she will not even answer the phone. Not very professional on her part. Again I was not trying to upset her. I e-mailed her to lighten it up-did your mom ever teach you that it is not good to hang up on people? No response-sorry did not want drama, but I guess this one is on me.

Rodriguez spoke to Getter about the email. Getter said that she had spoken to Julie about the incident and "everything was resolved." Dkt. 103, ¶ 228.

In March 2015, Atlas announced a reduction to its production schedule as a result of decreasing demand. This led to a corresponding reduction in hours for employees. In response, Hart sent Rodriguez the following email:

> This came as quite a shock! I know times are slow so from a business standpoint you need to make changes. We are told we need to hold people accountable for their decisions. So I guess just wanted to let you know how your decision affected some of us. More than one person is not happy with this. All of us will definitely make this work but, it sure would have been nice to have had a heads up before it started so we could have rearranged our personal schedules. Next week would be A-days scheduled Monday and Tuesday to work so it would have made more sense to have A-days start the new schedule out, it has been said more than once that people are more willing to buy into something if they are allowed to be included in the decision. That was not allowed to happen. A lot of people are upset about this but don't want to say anything. I do not in any way want to start any drama that is why I wanted to voice my thoughts.

She also wrote: "I did not send this to other people yet—I plan to but just wanted you to read it and tell me if it sounds too angry. I need to get it off my chest."

In response, Rodriguez wrote the following:

> I understand your concerns. I am not sure who you are planning on sending this to, but I think the company is trying to do what is best for the majority. I am glad to know that everyone is willing to make it work, even if they are upset about the decision. Things have been getting slow for a while now, so for now, this is the route that made the most sense for the market demand level. It does not sound too angry, but I think that there was a lot of thought put into the decision. Julie, Jamie, Scott and Joe all said that they are willing to help answer any questions or concerns anyone has. I am trying to be as honest and upfront with everyone as I can. When I get information, I will get it to you.

The same day, Hart told Rodriguez that she was upset because she believed the company was not looking out for her. Instead of reducing the schedule, the company should have laid off "new people."

Two days later, Hart sent an email to management that included the same language as the email she sent to Rodriguez. Morden (a "plant coach") thought that the email was indicative of Hart's difficulty with change. Joe Knutson (another "plant coach") also reviewed the email and believed that it was inappropriate for Hart to speak on behalf of other employees.

The human resources manager, Julie Casperson, called Hart about the email. In notes that she sent to Morden and Knutson, Casperson wrote that Hart's demeanor during the conversation was "very angry" and "rude." Hart also repeated her view that the company should have laid off less senior employees rather reduce the schedule for everyone.

## E.  Merger with Badger Mining

In April 2015, Atlas merged with defendant Badger Mining Corporation. Hart retained the same position.

The Badger Mining associate handbook includes a "corrective action policy" that includes the following language: "[I]f an Associate goes against company policy, philosophy or

beliefs, or acts in a manner that may endanger themselves or their team members' corrective action will be used to encourage a change in behavior, including verbal and/or written warnings or suspension without pay for a defined period of time." While employed by Atlas and Badger Mining, Hart did not receive any verbal warnings, written warnings or any other corrective action.

On May 5, 2015, "team coach" Lance Stromnes emailed Rodriguez and Morden about concerns he had related to Hart and another employee, Brenda Sogla. Stromnes wrote that the two were "like school yard bullies." As an example, he wrote that "they get snippy with Judy if the lab isn't in a certain order." As to Hart in particular, Stromnes wrote that she was making comments that new employees should be laid off "so the veterans could get all their hours" and that she "snapped at the guys for chairs in the break[room] not being the way she wants them." Stromnes believed that Hart's actions "create[] an uncomfortable work environment." No one informed Hart about this email while she was employed by Badger Mining.

In the summer of 2015, Badger Mining began offering voluntary layoffs at two-week intervals. Around this time, Hart was expressing concern to Rodriguez approximately twice a week about Badger Mining's decision to cut hours. Hart expressed these concerns to coworkers as well.

On September 3, 2015, Hart and Rodriguez had a conversation about the company's treatment of Hart and Hart's response to it. Among other things, Hart said that the company was treating her like a "peon" and that the company did not include non-salaried employees in discussions. Rodriguez told Hart that she was being "negative" and asked her to talk about any concerns with Rodriguez rather than coworkers. In response, Hart became upset and accused Rodriguez of "speaking out of both sides of her mouth." Dkt. 102, ¶ 81.

**F. Reduction in force**

In late September 2015, Badger Mining offered early retirement to 21 employees over the age of 60 as a result of continued deteriorating business conditions. Six employees accepted the offer. Badger Mining then determined that it needed to eliminate 33 positions, including four of 21 "coatings laboratory technician" positions, which was Hart's position. Plant coaches Morden and Knutson were responsible for determining which coatings laboratory technicians would be laid off.

The Badger Mining handbook lists the following criteria to be considered in making determinations about layoffs:

- required job functions for production;

- voluntary layoffs;

- work habits and attitude;

- prior work performance.

Morden and Knutson also considered Badger Mining's "Five Circles," which "further define [the company's] expectations for working effectively in a team setting." *Id.*, ¶ 91. The Five Circles require employees "to communicate in a respectful manner, demonstrate mutual respect and support for other team members, and work together to achieve common goals and missions." *Id.*, ¶ 92.

Morden and Knutson determined that all the coatings laboratory technicians were able to perform the required job functions for production. So to help them make their decision, Morden and Knutson did the following (1) reviewed the technicians' 2014 performance evaluations; (2) reviewed information regarding the laboratory technicians' disciplinary history; (3) considered their own knowledge and observations regarding each laboratory technician;

and (4) solicited feedback from the team coaches regarding each technician's performance, attitude, and team abilities.

Team coaches Rodriguez, Miller, Dave Collins, Nick Hanson, and Brady Laufenberger provided feedback about Hart. Rodriguez reported that Hart had displayed increased negativity since the merger, particularly toward less senior coworkers. Collins and Hanson reported that Hart displayed "negativity" and was "easily swayed to the dark side." Laufenberg reported that he had heard that Hart was a "pot stirrer." Miller said that Hart had a negative attitude sometimes, but no more than anyone else.

After completing this process, Morden and Knutson recommended that Badger Mining eliminate the positions and terminate the employment of the following lab technicians:

- Amy Matheny (age 37)

- Tina Hinrichs (age 38)

- Rebecca Fitzmaurice (age 52)

- Paulann Hart (age 58)

Badger Mining eliminated a fifth laboratory technician in the research and development department, but Morden and Knutson were not involved in that decision.

Supervisors concluded that the other eliminated technicians had problems similar to Hart's. Matheny's supervisors stated that she "play[ed] he said, she said;" her peers did not want to work with her, in part because she "twist[ed] things" and "play[ed] the victim;" and she had a "bad attitude" and "h[e]ld a grudge." Hinrichs's supervisors stated that he was not trustworthy and his performance was not improving. Fitzmaurice's supervisors said that he was not trustworthy and had shown difficulty working with a peer.

Lori Phillippi, Badger Mining's co-president, believed that Hart was "in the middle" in terms of performance. Dkt. 103, ¶ 79. But she concurred in the decision to terminate Hart. Based on her discussions with the coaches, Phillippi believed that Hart had been "stirring things up." *Id.*, ¶ 109.

In a letter to the employees who were laid off, Badger Mining explained its decision: "BMC's decision to involuntarily end (or not end) those positions and employment was based on its determination of which individuals within the company were most qualified to provide the skills and perform the responsibilities that are most critical to the company's business."

After being informed that she was being laid off, Hart sent an email to the vice president of operations that included the following language:

> These last months have been very stressful on everyone. I've always thought Badger respected honesty. I'm not afraid to let others know I disagree with something, but I don't pull others in to cause a chaotic situation. I don't thrive on drama! Associates talk among themselves or their small teams because they are worried. That's only human nature. So few tell leadership how they really feel.
>
> Unfortunately, telling my lead how I felt is how I think I ended up terminated.

## G. Laboratory technicians who were retained

Of the 17 laboratory technicians who remained at Badger Mining, nine were at least 40, five were at least 50, and two were older than Hart. Hart's ratings on her 2014 evaluation were higher than any of the other technicians who were retained. Among the technicians retained were Tracey Morden (age 37), Michelle Kudrick (age 41), and Brenda Sogla (age 50). (To avoid confusion with Jamie Morden, the court will refer to Tracey Morden as simply "Tracey.")

In December 2014, Tracey received a written "coaching" that included the following language:

> In the past 2 weeks, you have been coached on at least 3 occasions . . . about the decision of Plant Coach locations at Merrillan East and West. . . . This discussion had been taking place and moving forward until you spoke up and started questioning again why Jamie and Scott couldn't just trade locations. You proceeded to express your opinion as to why that was best, although that decision had already been made and discussed with you on that not being an option. Your behavior and comments reverted the conversation backwards and was disrespectful to the situation at hand and the decision that had been made by other Coaches and Leaders.
>
> . . .
>
> Any further actions that do not support the team philosophy and expectations of an Associate at Atlas Resin Proppants will be addressed with further disciplinary action up to and including termination.

Tracey received the following comments in her 2014 performance evaluation: "Tracey has a strong personality, and realizes that. She needs to continue trying to modify how she communicates with others to help change how people perceive her. Tracey also needs to take any coaching constructively, not personally."

Kudrick received the following comments in her 2014 performance evaluation:

- Michelle has been working hard on communicating in different ways tha[t] she is not use to with her new team.

- Michelle has been working on improving her communication with her team and others.

- She will continue to improve in this area as she encounters more issues.

In May 2015, Kudrick received a written "coaching" that included the following language:

Teamwork is a very essential part of BMC's culture and values. The teamwork between Tina and Michelle has not been to the level that is expected and needs to improve. The rest of their teammates have been affected by the feuding between them. Michelle and Tina need to figure out how to get along for the time they are working together. The physical work being done has been very good but the relationship has not. Together they need to develop a communication system that allows them to continue doing their jobs very well and be civil to each other and teammates.

There will be follow-up conversations to make sure the expectation is being met. If it is not, a full investigation will be done and appropriate disciplinary action will be determined.

Sogla's supervisors made the following comments about her: "feeds off Paulann"; "has operator knowledge"; "needs coaching but is coachable"; "negativity"; "easily swayed to the dark side"; "not a fit"; "her and Paulann feed off each other"; and "keeps mouth shut most of the time."

## ANALYSIS

### A. Motion for leave to file a response to plaintiff Paulann Hart's amended declaration and proposed findings of fact

A threshold issue relates to the admissibility of some documents that Hart obtained from Badger Mining in discovery, including evaluations of several Badger Mining employees. Badger Mining objected to proposed findings of fact that relied on those evaluations, contending that they were not properly authenticated. In response, Hart said that the evaluations were authenticated by Badger Mining's "sworn discovery responses," and she asked the court for leave to amend her filings to make that showing. Dkt. 107. The court allowed Hart to supplement the record, but reserved a ruling on admissibility. Dkt. 117. Badger Mining then filed a motion in which it asked for leave to file a response to the supplement, along with

the proposed response, in which it argued that it would be prejudiced by the late filing. Dkt. 118.

The court will grant Badger Mining's motion to file a response, but it will also assume that the documents at issue are admissible. The best practice in a situation like this would be to ask the producing party to stipulate to the authenticity of the produced document or to serve a formal request for admission that the documents are authentic. But it is not clear whether that is always required. There is no bright line rule in this circuit regarding whether or when the production of documents is itself sufficient to authenticate them. *Compare Castro v. DeVry Univ., Inc.,* 786 F.3d 559, 578 (7th Cir. 2015) ("The mere act of producing a document in response to a discovery request based on the content of the document does not amount to an admission of the document's authenticity."), *with Thanongsinh v. Bd. of Educ.,* 462 F.3d 762, 779 (7th Cir. 2006) ("[T]he defendants cannot reasonably question the reliability of [documents] made by [their] employees and produced in the course of this litigation. Requiring authenticating affidavits in this case would be an empty formality.") (internal quotations and citations omitted). Neither party acknowledges the nuances in the law or develops an argument regarding how the law applies in this case. But even if the court assumes that the documents are admissible, they make no difference to the outcome of the case, so it is not necessary to resolve the issue definitively.

## B. Motion for summary judgment

The only question raised in Badger Mining's motion for summary judgment is whether Hart has adduced sufficient evidence to allow a reasonable jury to find that Badger Mining terminated her employment because of her age. Following the guidance in *Ortiz v. Werner*

*Enterprises, Inc.*, 834 F.3d 760, 763 (7th Cir. 2016), Hart relies on several types of evidence to support her claim. The court will consider each in turn.

### 1. Pretext

The parties devote much of their briefs to debating the veracity of Badger Mining's explanation for terminating Hart, so the court will begin with that issue. Evidence that the employer is lying about its reasons for taking an adverse action can support a discrimination claim. *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 487 (7th Cir. 2015). The reasoning behind this is straightforward: if the employer's stated reason is a pretext, it suggests that the employer may be trying to cover up a reason that is prohibited by law. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000).

In this case, Hart does not allege that the reduction in force was itself a pretext for getting rid of older workers. It is undisputed that Badger Mining was suffering financially and needed to lay off some employees. Rather, Hart's claim is that Badger Mining chose her rather than another employee because of her age.

Badger Mining's explanation for its decision is simple: in the months after the company began experiencing financial distress and making cut backs, Hart became increasingly negative, complaining to both coworkers and management, to the point that she was making other employees uncomfortable. Badger Mining points to the following incidents that informed its decision:

- in January 2015, Hart became upset with a coworker for taking too many overtime shifts; when the coworker hung up on Hart, Hart sent her an email stating "DID YOUR MOM EVER TELL YOU IT IS NOT NICE TO HANG UP ON PEOPLE!!!!!!"; she then sent Rodriguez an email, accusing the coworker of being unprofessional; Hart also wrote, "sorry did not want drama, but I guess this one is on me";[1]

---

[1] Rodriguez did not forward the email to Morden or Knutson, who were primarily responsible

- in March 2015, after the company reduced its production schedule, Hart wrote to management, including Morden and Knutson, that it was "a shock," that it would have been nice to have had a heads up before it started," that "[a] lot of people are upset about this," and that she did not "want to start any drama," but "wanted to voice [her] thoughts"; Hart also complained that employees were not included in the decision;

- in March 2015, the human resources manager told Morden and Knutson that Hart had been "very angry" and "rude" during a conversation about Hart's email and that Hart had expressed the view that the company should have laid off less senior employees rather than reduced hours for everyone;

- in March 2015, Hart told Rodriguez that she was upset because she believed that the company was not looking out for her; instead of reducing the schedule, the company should have laid off "new people";

- in May 2015, a supervisor emailed Rodriguez and Morden about Hart, writing that Hart was "like [a] school yard bull[y]," that she "g[o]t snippy" with coworkers, and that she was "creat[ing] an uncomfortable work environment";

- in the summer of 2015, Hart was expressing concern to Rodriguez approximately twice a week about Badger Mining's decision to cut hours;

- in September 2015, Hart complained to Rodriguez that the company was treating her like a "peon" and that the company did not include non-salaried employees in discussions; Rodriguez told Hart that she was being "negative"; Hart became upset and accused Rodriguez of "speaking out of both sides of her mouth."

These incidents are all undisputed. And they provide ample support for Badger Mining's conclusion that Hart was not handling the company's changes well and that Hart was creating conflict with other employees. Nevertheless, Hart says that a reasonable jury could find that the incidents did not actually motivate the decision to termination her, for several reasons.

---

for the decision to terminate Hart. But the incident is relevant because Rodriguez provided input to Morden and Knutson and the incident provides support for Rodriguez's view that Hart was becoming increasingly negative toward her coworkers. But even if the court limited its consideration to the evidence considered by Morden and Knutson directly, Badger Mining would still be entitled to summary judgment.

*Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 465 (7th Cir. 2014) ("An employee can demonstrate that the employer's reasons are not credible through evidence showing that the proffered reasons had no basis in fact, were insufficient to motivate discharge, or did not actually motivate his discharge.").

### a. Hart's performance

Hart says that the above incidents are not related to her performance, which was supposed to be the most important criterion when deciding which employees to lay off. In support of this contention, she cites an email from the human resources manager, who wrote that "it is very important to retain high performers." Dkt. 103, ¶ 67. Because her supervisors consistently praised her ability to do her job, Hart says that Badger Mining should have retained her.

Casperson was not directly involved in making lay off decisions and Hart does not cite any evidence that Morden or Knutson received Casperson's email. It is undisputed that Morden and Knutson relied on a broader range of criteria, including attitude, communication skills, and relationships with coworkers. Regardless, the term "performance" is itself broad and legitimate considerations include the type of conduct involved in the incidents listed above. *Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1158 (7th Cir. 2014) ("[O]ur analysis of an employer's legitimate expectations does not merely consider whether a plaintiff's actual job performance was satisfactory—it is a much broader analysis, which allows fact finders to consider factors such as insubordination and workplace camaraderie."). It is hardly surprising that an employer going through a reduction in force would consider the way that an employee has responded to the company's recent reversal of fortune. If the employee is perceived as

unable to adapt and potentially damaging to the morale of her coworkers, then she could also be perceived as a liability to the company, regardless how technically proficient she is.

The reasons Badger Mining gave for laying off the other laboratory technicians bears this out. Supervisors of the other employees laid off stated that they were difficult to work with, had a bad attitude, and were not trustworthy. This focus on the employees' interaction with their coworkers is consistent with Badger Mining's reasons for terminating Hart.

Hart makes a related argument that her termination is inconsistent with her most recent performance evaluation, in which she received positive ratings in all categories, including those relating to being a "team player" and communicating effectively. But Hart's evaluation has limited probative value because she received it before the company began making the changes to which Hart objected and before most of the incidents at issue in this case. What matters is Badger Mining's perception of Hart at the time of the reduction in force, not at the time she was evaluated almost a year earlier. *Burks v. Wisconsin Dept. Of Transp.*, 464 F.3d 744, 753 (7th Cir. 2006) ("Although [the plaintiff] may have been performing adequately at the time of her positive evaluation, the critical inquiry is her performance at the time of [her termination].") (internal quotations omitted).

### b. Disciplinary history

Hart says she was never formally disciplined for any of the above incidents in accordance with company policy, which shows that they were not as serious as Badger Mining says they were. She cites language in the company handbook, which states the following: "if an Associate goes against company policy, philosophy or beliefs, or acts in a manner that may endanger themselves or their team members' corrective action will be used to encourage a change in behavior, including verbal and/or written warnings or suspension without pay for a

defined period of time." Dkt. 103, ¶ 132. But this policy does not provide clear guidance on when a supervisor should take formal disciplinary action. A few of the retained technicians had been disciplined, but Hart does not cite evidence that her own supervisor imposed formal discipline on other employees who engaged in conduct similar to Hart's.

Regardless, an employee's disciplinary history was only one factor that Badger Mining considered. It is important to remember that Badger Mining did not fire Hart for engaging in misconduct, but as part of a reduction in force. Again, in that context, it is not surprising that an employer would focus more on an employee's overall fit with the company rather than simply her technical abilities or number of write ups. Hart does not allege that she was the only terminated technician who did not have a disciplinary history.[2]

### c. Badger Mining's policies and practices related to employee grievances

Hart says that Badger Mining should not be believed when it says it was displeased with Hart's comments and attitude because it encouraged her to make those comments. She relies on the following facts: (1) she was a member of the "Associate Development Team" and the "Badger Team," which were designed to "give a voice to the employees," Dkt. 99, at 15; (2) "management" told members of those teams that they could "say what's on their mind" and "be open and honest about issues and concerns," *id.*; and (3) Cody Wickersheim and Dan Valiquette (who Hart identifies as company "leaders," Dkt. 103, ¶ 7) told Hart that they "respected her for her honesty," *id.*

---

[2] Hart does allege that employees with more serious disciplinary histories were retained, but this shows only that Badger Mining did not emphasize disciplinary history when making lay off decisions, which it was entitled to do.

This argument is simply not persuasive. Wickersheim and Valiquette were not involved in deciding whether to eliminate Hart's position, so their opinion has little relevance. And Hart does not allege that she made any of the statements at issue in this case in her capacity as a member of the "Associate Development Team" or the "Badger Team." Regardless, it was reasonable for Badger Mining to view Hart's statements and conduct as more than simply expressing a concern. A company philosophy that employees should be free to speak their minds is not an invitation to complain excessively and create conflict.

### d. Factual basis for Badger Mining's nondiscriminatory reasons

Hart also challenges the factual basis for Badger Mining's stated reasons for laying her off. First, she says that she did get along her with her coworkers, citing the testimony of three who spoke favorably of her. But this testimony is not probative because Badger Mining is not alleging that Hart could not get along with anyone. Rather, one of its concerns was that she was pitting more senior employees against less senior ones by repeatedly expressing the opinion to both supervisors and coworkers that less senior employees should be laid off so that more senior employees were not affected. Hart does not deny that she made such statements. Although she says that she did not instigate such conversations with coworkers, she does not cite any evidence undermining Badger Mining's belief that she was contributing to an uncomfortable work environment. She also says that "her conduct was no different than other employees with seniority," Dkt. 99, at 18, but she does not identify any other employees and she does not cite any evidence that Morden or Knutson was aware of similar conduct by other employees.

Hart does challenge the factual basis of a May 2015 email from supervisor Lance Stromnes, who wrote that Hart was a "bully." Stromnes said that he was relying in part on

statements from Judy Thronson and Nate Coblentz, but Hart cites declarations from Thronson and Coblentz, who say that they never complained to Stromnes about Hart. But the question is not whether Badger Mining was correct in its assessment; Hart must show that Badger Mining is lying to cover up a discriminatory motive. *Zaya*, 740 F.3d at 1158–59 ("The pretext inquiry focuses on whether the stated reason for the adverse employment action is in fact the reason for it—not on whether the stated reason is accurate or fair.").

It is undisputed that Morden and Knutson received the email from Stromnes. Hart cites no evidence that Thronson or Coblentz ever told Morden or Knutson that Stromnes's email was inaccurate, so Morden and Knutson had no reason to question Stromnes's statements. And Hart does not allege that Stromnes lied about her because of her age, so the email does not provide a basis for asserting a discrimination claim under a "cat's paw" theory. *Robinson v. Perales*, 894 F.3d 818, 832 (7th Cir. 2018) (under "cat's paw" theory, "[t]he plaintiff must provide evidence that the biased subordinate actually harbored discriminatory animus against the victim of the subject employment action, and evidence that the biased subordinate's scheme was the proximate cause of the adverse employment action.") (internal quotations omitted).[3]

Finally, Hart questions the accuracy of a spreadsheet that Badger Mining says that Morden and Knutson considered. The spreadsheet is a summary of comments made by supervisors about various employees, including Hart. She says that the spreadsheet may have been altered as a result of her claim against Badger Mining because "[t]he properties print out

---

[3] Hart also challenges the Stromnes email on the ground that it is hearsay. But Badger Mining is relying on the email for the effect it had on Knutson and Morden, not for its truth, so the email is not hearsay.

pertaining to this spreadsheet indicates that it was first created on October 9, 2015, but last 'modified' on February 9, 2016," which is after Hart filed a charge with the Wisconsin Equal Rights Division. Dkt. 99, at 8. But this allegation is speculative. Badger Mining says that the document indicates that it was "modified" on February 9 because that is when the company emailed the document to defense counsel, who then resaved it. Dkt. 103, ¶ 202. Regardless, Hart does not allege that the spreadsheet is inconsistent with the testimony of the witnesses, so even if the court disregarded the spreadsheet, it would not change the outcome of this case.

### 2. Treatment of younger employees

More favorable treatment of similarly situated employees outside the protected group is probative of discriminatory intent. *Eaton v. Indiana Dept. of Corr.*, 657 F.3d 551, 559 (7th Cir. 2011). Hart has an uphill battle on this front because other technicians who were retained were older than Hart. Of the 17 technicians that Badger Mining retained, five of them were 50 or older and two of them were older than Hart. Dkt. 102, ¶ 117. *See also Ripberger v. Corizon, Inc.*, 773 F.3d 871, 881 (7th Cir. 2014) (inference of age discrimination "undercut" when employee is replaced by others of a similar age or older).

Hart tries to group herself with Rae McCann, a technician who was terminated at the age of 62. But Badger Mining says that McCann was not part of the group that Morden and Knutson considered. Rather, a different supervisor, Erica Grant, selected McCann for termination. Dkt. 41 (Grant Dep. 39:1–25). Hart does not cite any contrary evidence. Employees who are under the purview of different decision makers are not similarly situated. *Ellis v. United Parcel Service, Inc.*, 523 F.3d 823, 826–27 (7th Cir. 2008) ("Different decisionmakers may rely on different factors when deciding whether, and how severely, to discipline an employee. So, to be similarly situated, [an employee] must have been treated

more favorably by the same decisionmaker that fired the [plaintiff].").  For the same reason, Hart cannot rely on Badger Mining's decision to retain Kory Kowahl and Nate Coblentz, who are younger than Hart. Badger Mining cites evidence that both employees worked in different departments and reported to different supervisors, so Knutson and Morden did not review their positions either. Dkt. 42 (Kowahl Dep. 5:6–25); Dkt. 41 (Grant Dep. 82:18–83:6); Dkt. 26 (Knutson Dep. 21:6–19). Again, Hart does not cite any contrary evidence.

Hart discusses three other younger technicians in her brief, Tracey Morden, Michelle Kudrick, and Brenda Sogla. Badger Mining retained each of these employees despite the reduction in force, which, according to Hart, shows age bias because she was a better employee. As to Tracey Morden, Hart says that she received a "coaching" in 2014 for "continu[ing] to question [team decisions] once decisions have been made." Dkt. 103, ¶ 137. But this disciplinary action does not help Hart because it only confirms that supervisors did not appreciate employees' aggressive questioning as a general matter. And it is not probative of discrimination because the coaching occurred almost a year before the reduction in force. Hart cites no evidence that Tracey continued to display the same problem in 2015.[4]

Kudrick received a written "coaching" in May 2015 because "[t]he teamwork between [Kudrick and another employee] has not been to the level that is expected." Dkt. 103, ¶ 140. But Hart fails to explain how difficulty getting along with one coworker is comparable to the

---

[4] Hart quotes various comments that Tracey's supervisors made about Tracey in 2015, but it is not clear what some of them even mean. Dkt. 103, ¶ 203 ("Rides a fine line, s[t]ill does good work, attitude can be hard, focuses on one thing (review can be example with attitude-focused on that not the rest of review), hoped there would be more improvement, not using leadership classes, looking for an exceeding expectation may be the reason for her doing more."; "very knowledgeable"; "one upper, selfish person."). Regardless, Hart does not develop an argument that the comments show that Tracey is similarly situated to her.

problems that Badger Mining perceived with Hart. In fact, Kudrick's supervisors later stated that her communication skills were improving and that she "brings solutions rather than problems." *Id.*, ¶ 204.

The comments about Sogla on the spreadsheet Morden and Knutson reviewed were nearly identical to the comments about Hart. Both were perceived as expressing "negativity" in part because they both "feed off" each other. But the comments on the spreadsheet do not tell the whole story. Badger Mining's concerns about Hart were not limited to a general perception that Hart was "negative." Rather, it was a more specific concern about the way that Hart was responding to changes that the company was making. Hart does not cite any evidence that Sogla was engaging in the same type of behavior. Regardless, Sogla was 50 at the time of the reduction in force; Hart was 58. The court of appeals has stated repeatedly that such a small age difference does not give rise to an inference of age discrimination. *Nagle v. Village of Calumet Park,* 554 F.3d 1106, 1118 (7th Cir. 2009) (comparator must be "substantially younger" than the plaintiff, which means at least 10 years); *Martino v. MCI Communications Services, Inc.,* 574 F.3d 447, 454 (7th Cir. 2009) ("Under the ADEA, in the case of younger employees that fall above the age of forty, the age difference must be ten years or greater in order to be presumptively substantial.").

### 3. Age-related comments

Hart cites two age-related comments made by Badger Mining supervisors. First, Hart says that Rodriguez referred to a man in his 50s as an "old guy" and wondered why his employer was "wasting" money on paying for him to take college classes. Second, Hart says that Cody Wickersheim, "an Advisory Team leader," made comments in 2012 or 2013 that the company

"needed to be younger" so that management could better relate to its workforce. Dkt. 99, at 21 and Dkt. 103, ¶ 8.

Neither of these comments is sufficient on its own to create a genuine issue of material fact. The alleged comment by Rodriguez is not related to the decision at issue in this case or even to Rodriguez's perception of an older worker's abilities or worth. The court of appeals has held consistently that similar comments are not sufficient on their own to prove a discrimination claim. *Fleishman v. Continental Cas. Co.*, 698 F.3d 598, 605 (7th Cir. 2012) ("[I]solated comments are not probative of discrimination unless they are contemporaneous with the discharge or causally related to the discharge decision making process. This comment is not contemporaneous because it came ten months before Fleishman's termination."); *Sun v. Bd. of Trustees of Univ. of Illinois*, 473 F.3d 799, 813 (7th Cir. 2007) ("[S]tray remarks that are neither proximate nor related to the employment decision are insufficient to defeat summary judgment."). Moreover, Hart ignores the fact that it was Rodriguez who gave her the 2014 evaluation that Hart relies on now to show that she was a "high performer." Hart does not explain why, if Rodriguez was biased against her because of her age, Rodriguez would have given her such a glowing evaluation only a year earlier. *See Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1147 (7th Cir. 1994) ("It seems rather suspect to claim that the company that hired him at age 47 had suddenly developed an aversion to older people two years later.") (internal quotations omitted). As discussed above, Hart does not dispute the factual basis for any of Rodriguez's concerns about her, particularly as to Hart's repeated comments about the way the company was handling its financial downturn.

The alleged comments by Wickersheim are simply not relevant. Hart says that Wickersheim "was included in communications" about the reduction in force, Dkt. 99, at 21,

but she does not cite any evidence that Wickersheim was actually involved in the decision to terminate her. In the absence of that kind of evidence, Wickersheim's alleged statements do not support Hart's claim. *Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 342 (7th Cir. 2016) ("Without some connection between the offensive conduct . . . and the termination decision, no reasonable jury could make the requisite inference that she was fired for discriminatory reasons.").

### 4. Offers of early retirement

Finally, Hart says that Badger Mining's discriminatory intent is shown by its decision to offer early retirement to employers 60 or older. This argument does not require extended discussion. The court of appeals has held repeatedly that offers of early retirement are not probative of age discrimination. *Ortony v. Nw. Univ.*, 736 F.3d 1102, 1103 (7th Cir. 2013) ("[R]etirement packages do not violate the ADEA. Retirement packages . . . are a benefit of age because they are the sort of offer one would pay to receive, rather than pay to avoid."); *Pitasi v. Gartner Grp.*, 184 F.3d 709, 714–15 (7th Cir. 1999) (offer of early retirement as alternative to laying plaintiff off was not discriminatory). Hart cites no authority to the contrary.

### 5. Conclusion

None of the evidence Hart cites calls into question Badger Mining's explanation that it terminated Hart primarily because of the way she reacted to the company's declining financial situation. Hart herself acknowledged this when she wrote to management that she believed she was terminated because she was "not afraid to let others know I disagree with something." Dkt. 29-10. Hart may be correct that Badger Mining should have been more open to criticism and respected her honesty rather than holding it against her. But that is not the question before

the court. Because no reasonable jury could find that Badger Mining terminated Hart because of her age, the court will grant Badger Mining's motion for summary judgment.

ORDER

IT IS ORDERED that:

1. Defendant Badger Mining Corporation's motion for leave to file a response to plaintiff Paulann Hart's amended declaration and proposed findings of fact, Dkt. 119, is GRANTED.

2. Badger Mining's motion for summary judgment, Dkt. 14, is GRANTED.

3. The clerk of court is directed to enter judgment in favor of Badger Mining and close this case.

Entered November 16, 2018.

BY THE COURT:
/s/

_____
JAMES D. PETERSON
District Judge